IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOTAYNUN LEE, as Administrator
of the Estate of Jataynun
Trayvon Fleming, Deceased, as
Next Friend of J.F., K.F.,
N.T., N.K., and J.W., Minor
Children of Jataynun Trayvon
Fleming, Deceased, and
Individually,



        Plaintiff,

                                    Civil Action No.  3:12cv471

CITY OF RICHMOND, VIRGINIA,
 et. al.,

        Defendants.


                    MEMORANDUM OPINION


        This  matter  is  before  the  Court  on  Defendant  Bevington's
MOTION  TO  EXCLUDE  PLAINTIFF'S  EXPERT  WITNESS  DR.  PHILIP  P.
HAYDEN  (Docket  No.  107),  DETECTIVE  BEVINGTON'S  MOTION  TO  EXCLUDE
DR.  KENNETH  OKAFOR  (Docket  No.  109),  DETECTIVE  BEVINGTON'S
MOTION  TO  EXCLUDE  CHAD  L.  STALLER  &  JAMES  MARKHAM  (Docket  No.
111),   DETECTIVE  BEVINGTON'S  MOTION  TO  EXCLUDE  DR.  ALI  Z.  HAMELI
(Docket  No.  113),  Defendant  Moore's  MOTION  TO  EXCLUDE  CHAD  L.
STALLER  AND  JAMES  MARKHAM  (Docket  No.  115),  Defendant  Moore's
MOTION  TO  EXCLUDE  DR.  KENNETH  OKAFOR  (Docket  No.  117),  Defendant

Moore's MOTION TO EXCLUDE DR. ALI Z. HAMELI (Docket No. 119), and Defendant Moore's MOTION TO EXCLUDE DR. PHILIP P. HAYDEN (Docket No. 121). For the reasons set forth below, the motions are granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts, which are derived from the Amended Complaint (Docket No. 38), are alleged to be as set forth below. At approximately 3:00 p.m. on July 14, 2010, unidentified officers of the Richmond Police Department ("RPD") arrived at a private residence on Beaufont Hill Drive in Richmond, Virginia, to arrest Jataynun Trayvon Fleming ("Fleming") on a warrant for robbery accomplished by use of a firearm and a homicide. The officers were armed and dressed in a manner consistent with that conventionally associated with members of the RPD's SWAT team.

Fleming, who was lawfully inside the residence, retreated to an upstairs bathroom and barricaded himself therein. Also present in the residence was Fleming's son and his son's mother, who were escorted outside by RPD personnel. Fleming's father, the plaintiff Jotayun Lee ("Lee"), arrived at the residence and informed the officers that Fleming did not have a firearm. And, indeed, it turned out that Fleming did not have a firearm in the bathroom or elsewhere inside the residence. Lee requested that

2

the RPD officers, including defendants Bevington and Moore, allow him to enter the residence and convince Fleming to surrender peacefully; Lee was not allowed to do so.

After considerable, but unsuccessful, efforts to induce Fleming to leave the bathroom and surrender, the RPD officers threw a "tear gas canister" into the bathroom where Fleming had barricaded himself.  Approximately two minutes later, Fleming came out of the bathroom while exhibiting symptoms common to exposure to tear gas (such as coughing and stumbling).  The Amended Complaint alleges that Fleming fell to the floor outside the bathroom.  At that point, Bevington and Moore fired a total of nine rounds at Fleming, who was struck multiple times in his hands, arms, torso, and chest.  Fleming subsequently died.  A forensic investigation revealed several bullet holes in the floor near the body, but no bullet holes in the walls.  There were also bullet holes in the ceiling of the room below the one where the shooting occurred.  Some of the bullets were recovered from that room and some were found in Fleming's body.

In response to questions from RPD investigators, Bevington and Moore claimed that Fleming had emerged from the bathroom, with his arms extended, and brandishing what they thought was a weapon towards the officers. Moore reported that he had fired one round at Fleming while Fleming was standing and that, when

3

Fleming failed to comply with verbal commands, additional rounds were fired by Bevington. Bevington reported that he had only fired at Fleming while Fleming was standing and stopped firing after Fleming fell to the floor. Bevington subsequently claimed that he had, in fact, fired at Fleming again when it appeared that Fleming was attempting to stand up. There was no firearm recovered from Fleming's person or the residence.

In the Amended Complaint, Lee asserted three claims, all under 42 U.S.C. § 1983, and named Moore, Bevington, the City of Richmond and several John Does as defendants.[1] On March 19, 2013, the City of Richmond was dismissed as a defendant in the case. (Docket No. 77). Subsequently, Counts II and III of the Amended Complaint were dismissed as to the defendants Bevington and Moore. (Docket Nos. 79 and 80). Therefore, the sole remaining claim against Bevington and Moore is Count I, wherein Lee alleges a claim against each of them for an unlawful use of deadly force in violation of the Fourth Amendment of the Unites States Constitution.

As part of his case, the Plaintiff intends to use evidence proffered in the reports of five expert witnesses: Philip P.

---

[1] The Court has issued an order in conjunction with this opinion dismissing from this matter John Does 1-10 for lack of prosecution and John Does 11-20 for failure to name in the Amended Complaint.

Hayden (Ed.D); Kenneth C. Okafor (Ph.D); Ali Z. Hameli (M.D., P.A.); Chad L. Staller (J.D., M.B.A., M.A.C.) and James Markham (Ph.D.; J.D., CPCU). The experts submitted reports and some were deposed.

Bevington and Moore have moved to exclude the testimony of all experts, some in whole, some in part. After outlining the applicable legal principles which apply to all of the motions, each will be considered in turn.

## LEGAL STANDARDS

All of these motions seek to exclude the testimony of expert witnesses proffered by the Plaintiff. Federal Rule of Evidence 702 states that,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the tier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case

The current version of the rule, together with Rule 104(a)[2], incorporates and codifies the standards for admissibility of expert testimony that were set forth in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and its judicial progeny. As Daubert announced, the district court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589. The requirement that the testimony of an expert must pertain to "scientific, technical or specialized knowledge" is intended to establish "a standard of evidentiary reliability." Id. at 590. The requirement that the evidence of testimony will assist the trier of the fact to either understand the evidence or to determine a fact in issue are conditions that go to the question of relevance. Id. at 591. Another aspect of relevance "is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. That requirement is sometimes referred to as "fit," and "'fit' is not always obvious, and scientific validity for one purpose is not

---

[2] Under Rule 104(a), the proponent of the expert testimony must establish the admissibility of the testimony by a preponderance of the evidence. See Bourjally v. United States, 483 U.S. 171 (1987).

necessarily scientific validity for other, unrelated purposes."
Id.

In Daubert, the Supreme Court also provided a non-exclusive checklist of factors that a trial court can consider when evaluating the relevance and reliability of a proffer of expert scientific testimony:

(1) Whether a purportedly scientific theory or technique has been subjected to empirical testing and verification;

(2) Whether the theory of technique has been subjected to peer review and publication;

(3) the known or potential rate of error associated with the theory or technique;

(4) the level of general acceptance of theory or technique within the relevant scientific community.

Id. at 593-94. Finally, Daubert provides a reminder that that relevance and reliable expert testimony can still be excluded pursuant to Rule 403 if the probative value of the testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Id. at 595.

In Kumho, the Supreme Court applied the basic principles that animated its decision in Daubert to testimony that is not scientific in nature but rather based on the expert's knowledge

7

and experience.  In <u>Kumho</u>, the Court held that the gatekeeping responsibility, to assure the reliability and relevance of expert testimony, applies with equal force to non-scientific evidence and, indeed, to all expert testimony.  <u>Kumho</u>, 526 U.S. 149.  To that end, the Court, in <u>Kumho</u>, held that the factors outlined in <u>Daubert</u> can be pertinent to the gatekeeping function.  The Court made clear also that those factors constitute a non-exclusive recitation of matters to be considered in determining the reliability of expert testimony. <u>Id.</u> at 150.

The Daubert test's gatekeeping requirement serves to ensure that the expert witness in question employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.  <u>Kumho</u>, 526 U.S. at 152.  When a witness testifies on the basis of experience, "the district court must . . . require an experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'"  <u>Peters-Martin v. Navistar Int'l Trans. Corp.</u>, 410 F. App'x 612 (4th Cir. 2011) (quoting <u>United States v. Wilson</u>, 484 F.3d 267 (4th Cir. 2007) (citations omitted)).

The foregoing principles inform the resolution of the motions to exclude expert testimony by the Plaintiffs' expert witnesses.

**1.  Motions To Exclude Dr. Philip Hayden (Docket Nos. 107, 121)**

Dr. Philip P. Hayden tendered two expert reports (one on March 19, 2013; the other on May 28, 2013).  According to the Plaintiff's brief, Hayden is to testify as an "expert on use of force, police practices, effective tear gas on humans, firearms and bullet paths." Id. at 2.  In Hayden's March report, he expresses fourteen separate opinions.  In the May report, he expresses six opinions, many of which are the same as expressed in the March report.

The motions filed by Bevington and Moore seek to exclude all of the opinions to which Hayden proposes to testify.  The Plaintiff filed a fairly full brief in response to the motion filed by Bevington and then adopted that brief in response to the motion filed by Moore.  (See Docket Nos. 128 and 132).

In all but one instance (the use of force and police practices), Bevington and Moore contend that Hayden is not qualified.  In response to the motions, the Plaintiff defends the competence of Hayden as an expert on the ground that he testifies as an expert on the basis of his experience in each

9

category for which he is proffered as an expert, but then defends only the following opinions:

- Dr. Hayden's testimony on the effect of gas should not be excluded
- Dr. Hayden is competent to opine on the shootings scene and bullet path reconstruction
- There is no disagreement by defendants' expert with Dr. Hayden's methodology
- Dr. Hayden is qualified to opine on the use of force & SWAT police practices

Therefore, this opinion will attempt to discuss the opinions at issue by hewing closely to the points made in the Plaintiff's brief about the four topics that the Plaintiff does address.

**A.   Hayden's Qualifications To Testify About The Effect Of Tear Gas On Fleming**

Bevington[3] and Moore[4] both argue that Hayden is not qualified to testify about the effect that tear gas had on Fleming. Both note that Hayden is not a toxicologist and has never qualified as an expert in toxicology. Bevington also contends that Hayden has no medical training or experience that

---

[3] Docket No. 108, pp. 20-21.

[4] Docket No. 141, pp. 11-12.

would permit him to testify whether, or to what extent, Fleming was affected by tear gas.  Moore makes the same argument.

The Plaintiff's brief on the topic consists of one sentence that says:  "[t]he basis for Dr. Hayden's testimony on the effect of chemical tear gas on Fleming is his personal experience as well as the research which he conducted while with the FBI."  (Docket No. 128, pp. 13-14).  However, the record reflects that Hayden has never studied tear gas or any factors that might determine a person's reaction to it.  Although he has read some FBI and online materials about tear gas, he said at his deposition that he did not rely on them in forming his opinions.  To the contrary, Hayden said that he based his opinions on his observations of officers and agents who had been exposed to tear gas and, in so doing, acknowledged that reactions to tear gas vary and some people are capable of "shaking it off."

Hayden's proffered opinion about the effects of tear gas is that:

> when Officer Moore and Detective Bevington saw Mr. Fleming come out of the bathroom, they saw a man that was traumatized by the gas and was disoriented and confused.  I do not believe that Mr. Fleming had the presence of mind to react as Officer Moore and Detective Bevington stated.

11

(March 19, 2013, Hayden Report, p. 5; May 28, 2013 Hayden Report, p. 2.)

On this record Hayden is not qualified to render the proffered opinion on the effects of tear gas on Fleming because he has not explained how his experience leads to the proffered opinion or why that experience is a sufficient basis for the proffered opinion, or how his experience is reliably tethered to the facts. Accordingly, under the law of the circuit, Hayden does not qualify to testify on the effects of tear gas on Fleming.

However, that does not mean that Hayden cannot testify about the effects of tear gas generally based on experience obtained during the course of his career as an FBI agent and a SWAT team member. That is because Hayden's experience appears sufficient to allow him to give such testimony. But, that is a far different matter than testifying about what the effects of the tear gas were on Fleming on the day in question. Of course, the Plaintiff must lay an appropriate foundation for Hayden's experience-based testimony by demonstrating that Hayden has had sufficient experience in observing the effects of tear gas on human beings in sufficiently similar circumstances as to time of exposure and location in enclosed spaces. If that is done,

12

Hayden can give testimony explaining his observations about the effects of tear gas.

###    B.    Hayden's Qualifications To Opine On The Shooting Scene And Bullet Path Reconstruction

Bevington and Moore contend that Hayden is not qualified to testify as an expert about the reconstruction of the shooting scene, ballistics, or the trajectory of bullets.  In support of that view, they have shown that, at his deposition, Hayden admitted that he was not an expert in ballistics or bullet trajectories, that he does not have any expertise in the forensic inspection of bullets, and that he does not have any specialized training or education respecting to shooting scene reconstruction (Docket No. 108, at 11; Docket No. 122, at 17-18). Hayden also disavowed that he was a scientist or that he had conducted a scientific evaluation. (Docket No. 108, at 11). Hayden did say that he based his opinions on his experience with the FBI, (Docket No. 108, at 12-13; Docket No. 122, at 20-21), but he also said that he had never served as any sort of crime scene investigator or reconstructionist.  His experience on that score was limited to observing other analysts and occasionally helping them make simple measurements. (Docket No. 108, at 12; Docket No. 122, at 21). Notably, Hayden had to ask another consulting expert what measurements he should take when he

13

visited the scene of the shooting incident, (Docket No. 108, at 11-12; Docket No. 122, at 21), and then later sought to have another expert come in to make the measurements and render an opinion as to what happened.[5] (Docket No. 108, at 12).

The Plaintiff argues that Hayden's "experience and training as a firearms instructor" qualifies him to offer testimony about ballistics and trajectory analysis. Id. And, at his deposition, Hayden testified that, as to bullet trajectory analysis, "Within the FBI, I was considered an expert in that field." Hayden's June 20 Dep. T. 12:21-22. However, when asked directly whether he was an expert in the field of ballistics, Hayden answered, "I am not." Id. at 8:13. And, when asked directly if he was an expert in bullet trajectories, Hayden replied, "Only as an end user." Id. at 8:16.

Hayden went on to distinguish the experience of firing "thousands and thousands of rounds and seeing what those bullets do" from "research analysis" and categorically stated that he was not an expert in the latter. Id. at 8:17-9:6. This distinction reappeared later when Hayden was asked if he measured any possible degree of bullet tumbling and twisting as

---

[5] Hayden contacted a crime scene reconstruction expert because, "I did not consider myself a person that's been court certified as an expert and I thought it would be better if somebody like him would be able to come in here and do it." Hayden's Dep. T. 17:23-18:6.

they penetrated various solid objects at the scene. Hayden replied, "No. You'd have to go to research experts in that that [sic] did that. I did not do any of it." Hayden's June 20 Dep. T. 33:6. In the abstract, Hayden clearly understood the concept of bullet instability, based on his experience firing various types of rounds. Id. at 32:1-36:15. But Hayden, by his own admission, did not have the expertise to quantify that key variable in his expert report and did not even attempt to do so. Based on this record, the Court finds that Hayden is unqualified to provide an expert opinion on ballistics or bullet trajectories.

The Plaintiff also argues, without citing any evidence, that Hayden was considered by the FBI to be an expert in shooting scene reconstruction.[6] (Docket No. 128, at 20). In light of Hayden's limited experience as an assistant to reconstruction experts and his lack of specialized training in the discipline, as well as his candid admission that as a general matter, "I don't reconstruct crime scenes," Hayden's Apr. 23 Dep. T. 53:18,

---

[6] Hayden testified in his deposition, "I do not consider myself a court certified expert. I consider myself somebody that knows the basics of what has to be done. So I have an understanding of it." Hayden's June 20 Dep. T. 13:14-17. While the fact that Hayden has not previously testified as an expert is not a bar to his testimony in this case, the standard for expert witnesses demands more than simple knowledge of "the basics of what has to be done."

the Court finds that Hayden is unqualified to provide an expert opinion reconstructing the scene of the shooting.

**C.   Hayden's   Qualifications   To   Testify   About   Bullet Trajectories**

The Plaintiff proposes to have Hayden testify about the trajectories of the bullets fired by Bevington and Moore who say that Hayden is not qualified to testify on that subject either. To that challenge, we now turn.

Hayden's opinions about bullet trajectory are based on: (1) undisputed evidence of the location of bullet holes in the floor of the upstairs area where Fleming was shot; (2) undisputed evidence of the presence of bullet holes in the ceiling of the first floor beneath that area; (3) undisputed evidence that certain bullets were found in certain locations either in the area beneath the scene of the shooting or in Fleming's body; and (4) undisputed evidence of the location of Fleming's dead body.   Then, Hayden made certain assumptions about Bevington's height and the location of his shoulder and used that information in conjunction with the extensions of the trajectory rods, along with information about the angles between the floor and the trajectory rods, to form opinions as to Bevington's location at the time various shots were filed.   That is what the parties refer to as "bullet trajectory" opinions.

16

Both Bevington and Moore contend that Hayden is not qualified to issue opinions on those topics. Implicit in the challenges to Hayden's qualifications is the argument that he has no methodology that can be tested or traced back to any sort of publication or standards within a scientific or technical discipline. And, that is generally correct. For instance, Hayden summed up his approach during his deposition testimony: "I am not a scientist. I did not do this in a scientific way. And I've tried to explain that to you for the last four hours."[7] On the key issue of the potential error rate of his calculations of the bullet trajectories, Hayden said it was simply "my opinion" that the error rate was one degree of angle, without citing any publication or other authority. (Docket No. 108, at 17). Hayden characterized his own opinion about Moore's position during the shooting as a "guesstimate." (Docket No. 122, at 8). And, he also referred to Bevington's shoulder height as a

---

[7] Of course, experts do not need to be scientists where the relevant field relies on technical or other specialized knowledge instead of scientific principles. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). But insofar as Hayden offers opinions pertaining to trajectory analysis (or any subject for that matter), his statement is an admission that he did not apply any scientific methods or processes to fields which rely on scientific principles. With regard to the less scientific field of crime scene reconstruction, the Court merely quotes this statement as consistent with Hayden's lack of concern for any discernible standards of analysis and opinion presentation.

17

"guesstimate." (Docket No. 108, at 16). When later questioned about that assumed height, he baldly stated, "Seeing that this is not a scientific evaluation, I figured it really didn't matter." Id.

The Plaintiff has attempted to address this challenge by arguing that Hayden's basic measurements are not disputed by the Defendants' own expert. (Docket No. 128, at 20). That rejoinder is correct insofar as it goes, but it misses the point. The Defendants have challenged, not the measurements but the calculations that are based on those measurements and the failure of Hayden to account for certain variables within the field of ballistics in opining about the bullet trajectories. The Plaintiff even concedes that the Defendant's expert has incorporated a margin of error in his trajectory analyses while Hayden has declined to follow suit.[8] Id. In the face of a clear need for a technically or scientifically validated methodology, Hayden has offered little more than an insouciant shrug and a series of "guesstimates". The ability to properly place trajectory rods, by itself, does not make the resulting opinions the product of Rule 702's "reliable principles and methods." Accordingly, the Court finds that Hayden's scene reconstruction

---

[8] Contrary to the Plaintiff's assertion, the inclusion of a margin of error or rate of error is a difference in methodology.

and analyses of bullet trajectories are inadmissible for lack of qualification and as unreliable for lack of methodology.[9]

However, that does not mean that Hayden may not testify as to the measurements that he made respecting the location of bullet holes in the wall and floors and in the ceiling of the room below, and as to the placement of the trajectory rods.  Nor does this preclude Hayden's testimony about the general path taken by the bullets fired by Bevington and Moore, assuming that there is a foundation laid in other evidence to show that they fired bullets at Fleming, what the caliber of the weapons were, where rounds of that caliber were recovered (whether from Fleming's body or in the wall or in the room beneath where the shooting incident occurred).  That testimony is permissible because Hayden is qualified to testify about the method of marking the general direction in which bullets travel ("bullet path") based on his work with the FBI and his placement of rods in connection as part of that job as well as the instruction that he received from another expert about where and how to place the rods.  His testimony as a person who has fired weapons and seen the path that the bullets took also provides a

---

[9] Bevington also argues that Hayden committed spoliation when he threw away graph paper he used to reach his conclusions. (Docket No. 108, at 25-29). The Court does not find that issue necessary to the resolution of these motions and therefore will not reach the issue.

substantive experiential basis for his testimony on those topics.

### D.   **Hayden's Testimony on the Use of Force and SWAT Police Practices**

Bevington and Moore do not challenge Hayden's general qualifications to render an opinion about the standards for the use of deadly force by law enforcement officers. However, they do challenge the methodology that underlies his opinion based on his failure to specifically identify the content of any of those standards or how individual acts of the Defendants violated the particular standards. (Docket No. 108, at 20-21; Docket No. 122, at 22). When pressed on this issue Hayden stated, "I don't know what that standard is and you don't know what that standard is and nobody is really going to be able to nail that standard down." Hayden's Apr. 23 Dep. T. 47:8-12. Notwithstanding repeated inquiries from defense counsel, Hayden was unable to supply any predicate for his opinion that Bevington and Moore violated the unidentified standards for reasonable officer conduct to which Hayden referred. See id. at 45:23-48:10. Under that circumstance, it is impossible for Hayden to offer an admissible opinion on the Defendants' compliance with those standards. Indeed, by his own words, Hayden has reduced his opinions on compliance with the unidentified standards to ipse

*dixit* entirely devoid of meaningful principles. The Court is obligated to exclude Hayden's testimony about the Defendants' compliance with the unidentified law enforcement standards and procedures respecting the use of force because his opinions on this topic are neither relevant nor reliable.

However, the record shows that Hayden has experience on the use of force while he was with the FBI and as commander of a SWAT team and instructor on SWAT team programs at the FBI Academy. Upon a proper foundational showing that Hayden knows the procedures used by the FBI respecting use of force, a showing that the FBI's procedures were acceptable in the field and were actually used, and a showing that Hayden has experience in using those procedures would permit Hayden to testify as to when, and under what circumstances, the use of deadly force is appropriate when effecting an arrest for a person wanted in connection with violent crime. Testimony of that sort is experience-based, not based on unidentified standards. And, it appears from Hayden's report and deposition that he can explain how his experience leads to his conclusions about when it is appropriate to use deadly force, why his experience is a sufficient basis for that opinion, and how his experience is reliably applied to the facts. And, of course, he can be asked a hypothetical question based on the facts proved (or to be

proved) in the case as to whether use of deadly force was appropriate on the basis of the hypothetical.[10]

Having dealt with the only four topics that the Plaintiff addressed in his response to the motions to strike Hayden's many opinions and having disposed of them as set forth above, it is unnecessary to address any of the other many opinions that Hayden presented in his two expert reports and that are discussed at some length in the motions of Bevington and Moore.[11] Hayden will be allowed to testify to the extent set forth above and otherwise the motions of Bevington and Moore to exclude the testimony of Hayden on the topics that the Plaintiff chose to defend in his response brief will be granted. In other words, Bevington's MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS DR. PHILIP P. HAYDEN (Docket No. 107) and Moore's MOTION TO EXCLUDE DR. PHILIP P. HAYDEN (Docket No. 121) will be granted in part and denied in part.

---

[10] Counsel for the Plaintiff must present to opposing counsel and to the Court a written statement of the hypothetical question before posing it. That will afford adequate opportunity for resolving any objections.

[11] On their face, many of those opinions are speculative and utterly irrelevant to any issue in the case. However, given that the Plaintiff's brief in response to the motions by Bevington and Moore do not purport to support any of the many opinions that would fail Daubert analysis as speculant, the Court will not address them.

2.   **Motions to Exclude Dr. Kenneth Okafor (Docket Nos. 109, 117)**

Dr. Okafor is a nuclear engineer retained by the Plaintiff to offer opinions about the trajectories of the bullets fired in the incident, the location of the Bevington and Moore when those bullets were fired, and the sequence of gunshots. Both Bevington and Moore seek to exclude Okafor's opinions on multiple grounds.[12]

A.   **Reliability Challenges (Qualifications)**

First, the Defendants challenge Okafor's qualifications as an expert under the first element of the Daubert standard because Okafor has no training, expertise, experience, skill, or specialized knowledge in the field of ballistics, trajectory analysis, or crime scene reconstruction.  The Plaintiff appears unwilling to acknowledge the need for experience or training in these specific disciplines because in his response, he relies on Okafor's credentials in nuclear engineering and physics as proof that he is, generally speaking, "a scientist." (Docket No. 136, at 2-3).  But, the Daubert standard is both more permissive and more restrictive than that. An expert need not be a scientist to satisfy the requirements of Daubert, see Kumho, 526 U.S. at 147-

---

[12] Moore adopted Bevington's briefs to support his own motion.

148, but he must possess the professional status or personal experience of an expert in the relevant field. See id. at 152. In other words, an expert in one field is not per force an expert in other fields. Anderson v. Nat'l R.R. Passenger Corp., 866 F. Supp. 937, 948 (E.D. Va. 1994).

Okafor's CV shows that he is well-qualified as an expert in nuclear engineering and nuclear safety. But, there is no indication that Okafor has ever been involved in the fields of ballistics, trajectory analysis, or crime scene reconstruction before he was engaged by Plaintiff's counsel in this case. Okafor's methodology, which is discussed below, demonstrates that he approached his ballistics and trajectory analysis as a theoretical exercise in trigonometry. Okafor appears to have no understanding or appreciation for the any "real-world" variables that might inform a ballistic expert's opinion, let alone any sort of discernible record of demonstrated expertise in the field. Hence, Okafor is not qualified to give expert testimony about ballistics or trajectory analysis, whether scientifically-based or experienced-based.

Nor has Okafor any special knowledge, training, expertise, or experience in the reconstruction of crime scenes or the events surrounding shootings such as the one here at issue. That fundamental deficit forecloses Okafor's testimony about

24

what happened at the scene of the shooting, including the location of Moore and Bevington and the sequence of the shorts that were fired.

**B.    Reliability Challenges (Methodology)**

Next, the Defendants challenge the reliability of Okafor's methodology under the second element of the Daubert standard. Unscientific speculation is not admissible even if the purported expert is a genuine scientist. See Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996).

As indicated above, and consistent with his lack of expertise in the relevant fields of ballistics and trajectory analysis, Okafor approached his analysis as a simple mathematics problem. He assumed, without offering a justification, that all of the bullets traveled in perfectly straight lines through the bedroom floor, the kitchen ceiling, and Fleming's body. (Okafor Report at 2). This assumption neatly elided any question of bullet deflection as the shots passed through Fleming's body and the floor.   Furthermore, Okafor did not provide an error rate or acknowledge any variables within the field of ballistics that might complicate his analysis.

Worse still, Okafor encountered information that diverged from his calculations and simply ignored it.   For example, on page 3 of his report, he noted that the actually measured angles

25

of the trajectory lines intersecting the bedroom floor were different from his calculated angles. Okafor's only commentary on this point was that the angles were "comparable," and that "it is easier and more accurate to measure distances than angles." These comments, offered without any context or reference to the techniques and principles of ballistics and trajectory analysis, are the sole justification for Okafor's decision to dismiss the measurements in favor of his calculations.

Similarly, where the height of Bevington's shoulder, a key factor in Okafor's opinions, differed from Okafor's calculations on the point, Okafor ignored the actual measurement. Bevington's shoulder height was an important variable in calculating Bevington's estimated distance from the holes in the floor at the time of the shooting. Okafor acknowledged that "[f]rom the data provided, the Detective Bevington's [sic] shoulder is approximately located 61" from the floor when standing straight up." Okafor Report at 4. This is consistent with information received by Okafor indicating Bevington's overall height to be 75". Id. at 3. Yet Okafor states, without support, that "measurements provided a shoulder height of 54 [inches]," and then assumes the 54" for his subsequent calculations. Id. at 4.

26

As a result, his final estimates of Bevington's distance from the bullet holes are reduced by roughly a third. Id.

Okafor did not actually measure Bevington's shoulder height, nor does the record otherwise supply that information. The notion that a 6'3" man would have a shoulder height of 4'6" defies common sense and is illogical on its face. It is not clear what "measurements" Okafor was referring to, because he is not referring to either actual measurements of Bevington or the actual measurements of the bullet angles that Okafor discarded. Whatever these initial measurements entailed, Okafor's calculations based off of them did not correspond with other actual measurements of the bullet angles and Bevington's height. Rather than modify his methodology in response to these observed deviations or provide an appropriate rate of error, Okafor simply ignored them in favor of his simple mathematical model. This casual dismissal of conflicting data decisively demonstrates that Okafor's methods have not been empirically tested and verified. And while empirical testing and verification is not the only Daubert factor, there is not an iota of evidence that Okafor's methods have been peer-reviewed and published, gained acceptance within the fields of ballistics and trajectory analysis, or been offered with an appropriate rate of error. The Court therefore finds that Okafor's methods

27

are not sufficiently reliable to warrant the admission of his opinions on ballistics, trajectory, or the location of Bevington when he fired the shots that Killed Fleming.

**D.   Relevance Challenges (Factual "Fit")**

The Defendants also challenge the factual basis for Okafor's opinions under the third element of the Daubert standard, based on the questionable assumptions discussed above. To this, the Defendants add that Okafor based his opinions on the sequence of shots simply by assuming that the shots that had traveled the longest distance (under Okafor's simplistic analysis) must have been fired first (Docket No. 110, at 14 (citing Okafor Report, at 7)).

To bolster their argument, the Defendants cite the unpublished decision in Gonzalez v. City of Garden Grove, No. cv 05-1506, 2006 WL 5112757 (C.D. Cal., Dec. 4, 2006). Gonzelez, like this action, involved a Section 1983 claim arising out of an officer-involved shooting. The plaintiff in that action designated a metallurgist to offer, among other opinions, an opinion about the location of the officer when the officer fired his weapon. Id. at *9. The Gonzalez court excluded that testimony, ruling that "the reconstruction of the shooting appears to be speculative because it assumes many variables, such as the heights of the actors and the distances at which

28

they were standing, and relies upon a mathematical calculation using all of these assumed variables to reach conclusions about the shooting." Id. Okafor, like the purported expert in Gonzalez, has taken the liberty of assuming variables and applying simple mathematical formulas without regard for the actual facts that were available to him and without attempting to conform his simple models to the needs to the relevant fields of ballistics and trajectory analysis and scene reconstruction. These assumptions are fatal to the admissibility of Okafor's testimony because they cannot provide the necessary factual "fit" to make his opinions sufficiently relevant under Rule 702. Therefore, the testimony about ballistics, trajectory and scene reconstruction are excludable on this ground as well.

Finally, Moore separately objects that Okafor has not rendered any opinion specific to Moore's actions and therefore Okafor should not be allowed to testify about Moore. (Docket No. 117). That contention is correct on the face of Okafor's report and the Plaintiff has not responded to this objection by Moore. Therefore, the Court deems the objection to have been conceded.

For the foregoing reasons, DETECTIVE BEVINGTON'S MOTION TO EXCLUDE DR. KENNETH OKAFOR (Docket No. 109) and Moore's MOTION TO EXCLUDE DR. KENNETH OKAFOR (Docket No. 117) will be granted. That said, it appears that ballistics and bullet trajectory are

not really critical issues in this case whereas bullet path is significant.   The Plaintiff can call witnesses to show where Fleming's body was and to show where bullet entry (and exit where applicable) points were, and to show holes in the floor and ceiling.   Using Hayden's testimony, the Plaintiff can show the path taken by the bullets.   If, as the Plaintiff's evidence tends to show, Fleming was shot while on the floor, he may have a case for excessive force.   But, to make that case he does not need an expert on ballistics or bullet trajectory.

3.   **Motions to Exclude Dr. Ali Z. Hameli (Docket Nos. 113, 119)**

Dr. Hameli is a forensic pathologist retained by the Plaintiff to offer various opinions about the circumstances surrounding the decedent's death. Bevington and Moore challenge four of those opinions.[13] The Defendants have not challenged Hameli's qualifications as a forensic pathologist, but instead have challenged his methods and analysis as unreliable.

A.   **Opinions Regarding Fleming's Cocaine Use**

First, the Defendants challenge Hameli's opinions about Fleming's use of cocaine.   On that point Hameli opined that: (1)

---

[13] Hameli's expert report is simply a series of conclusions offered without any explanation as to his bases or reasoning. That, of course, runs afoul of the provisions of Fed. R. Civ. P. 26(a)(2)(B).   However, the Defendants did not raise a challenge under the rule.   Instead, the Defendants' arguments are based on deposition testimony where the expert was asked to explain the basis for his conclusions.

Fleming was a chronic cocaine user; (2) Fleming was nervous and irritable due to his chronic and acute cocaine use; and (3) Fleming's cocaine use on the day of the incident caused hallucinations, paranoia, and delusions.

In reaching his conclusions, Hameli relied only on a police report that Fleming was a heavy user of cocaine and indications that Fleming had cocaine in his system at the time he died. (Docket No. 114, at 5).  Hameli does not know how long, or to what extent, Fleming had used cocaine. Id.  Hameli does not know how much cocaine Fleming ingested on the day of the incident and does not know Fleming's tolerance for cocaine. Id. Hameli admits tolerance can vary by individual. Id.  Hameli does not know if Fleming has ever experienced hallucinations, paranoia, or delusions on any previous occasions because of cocaine use. Id. at 6.  During his deposition, Hameli initially said that he did not have any information about Fleming's hallucinations; he later claimed that Fleming was hallucinating because he "was not following any of the orders or requests that was [sic] put to him by the police officers, and that he was saying, he was coming out with . . . his junk." Id.

The Plaintiff's response is that Hameli has 50 years of experience as a doctor and pathologist and has published literature on "the subject [of pathology]." (Docket No. 134, at

31

6). The Plaintiff also emphasizes that the autopsy found cocaine in Fleming's system. Id. But this information, standing alone, does not provide an adequate factual foundation for any conclusions that Fleming's cocaine use was habitual or that his use of cocaine caused "hallucinations, paranoia, and delusions" on the day of his death. Those conclusions are therefore speculative. Furthermore, in the absence of any data about the amount of cocaine necessary to produce hallucinations, measurements of the quantity of cocaine in Fleming's system, or independent evidence that would indicate habitual use of cocaine according to the principles of pathology, it is impossible to conclude that Hameli's conclusions are reliable. Therefore, the opinions being offered on Fleming's use of cocaine are not the product of reliable principles and methods, and thus they are inadmissible under the standards of Daubert and Rule 702.

**B.  Opinions Regarding Fleming's Exposure to Tear Gas**

Next, the Defendants challenge Hameli's opinions about the effect of tear gas. Hameli's opinion on that topic was that Fleming's mental status was "complicate[d]" by his exposure to tear gas, which also severely irritated his eyes and respiratory system. Hameli Report, at 1. His only support for this opinion is his deposition testimony that he relied on the fact that Fleming was coughing. (See Docket No. 114, at 6). Hameli does

32

not know how much tear gas was fired into the bathroom where
Fleming was hiding (beyond the description "two cannisters"),
the actual chemical that was used, or the dimensions of the room
into which the tear gas was fired. Id. Hameli acknowledges that
some people are not affected or significantly bothered by tear
gas. Id.

The Plaintiff's response asserts that, "One does not even
have to be an expert to describe the effect of tear gas," and
goes on to defend Hameli's conclusion by reference to the fact
that Fleming ran out of the bathroom while coughing. (Docket No.
134, at 6). The Court takes this as a concession that a basic
opinion about the general effects of tear gas does not rely on
any "specialized knowledge" within the meaning of F.R.E. 702(a).
Furthermore, the Plaintiff has pointed to no facts or data that
provide a factual foundation for an opinion that would require
"specialized knowledge" of the specific effects of tear gas on
Fleming. See Zellers v. NexTech Northeast, LLC, 533 Fed.Appx.
192, 197-98 (4th Cir. July 17, 2013) (unpublished opinion)
(upholding exclusion of testimony about effects of exposure to
refrigerant gas where purported experts did not know the
duration or intensity of the exposure). Hameli's opinions about
the effect of tear gas on Fleming's mental status therefore lack

the necessary factual foundation and are inadmissible under
Daubert and Rule 702.

### C. Hameli's Opinions About The Sequence Of Gunshots And The Relative Position Of Fleming's Body At the Time of Each Shot

The third challenged opinion involves Hameli's conclusions about
the sequence of gunshots and the position of Fleming's body as
each shot occurred. The conclusions are interspersed with
descriptions of the physical impact of individual bullets, which
the Defendants have not challenged. Conclusion 6 of Hameli's
report is representative:

> Fleming was still in an upright position
> with his left side facing towards the master
> bedroom's door when the next successive
> bullet was fired by Detective Bevington,
> striking his right upper chest wall. The
> entry wound was above the right nipple. The
> bullet traveled superficially under the skin
> from left to right, almost horizontally, and
> exited the skin two inches to the right of
> the entry wound. The bullet then re-entered
> the right medial upper arm, injured the
> posterior aspect of the biceps muscles and
> lodged within the soft tissue of the right
> posterior aspect of the right mid upper arm.
> The trajectory of this fired bullet was from
> the left side of the body to the right and
> almost horizontal.

Hameli Report, at 2. The Defendants' challenge pertains to the
conclusions in the first sentence of the quoted paragraph. They
argue that those conclusions about the sequence of shots and

34

location of Fleming when the shots hit his body are not
admissible because:

> (1) Hameli did not inspect the house where
> the incident occurred (Docket No. 114,
> at 9);

> (2) Hameli did not know any measurements
> within the house, other than that one
> bullet was found in a wall about 15 to
> 17 inches from the floor (Id.);

> (3) Hameli did not know the specific
> distance between the officers and
> Fleming's body (Id.);

> (4) Hameli did not know the particular
> angle at which any of the shots were
> fired (Id.);

> (5) Hameli did not know the position or
> angle of Defendant Bevington's rifle at
> the time of the shooting (Id.);

> (6) Hameli did not know which of the five
> bullets found downstairs match up to
> which gunshot wounds or the sequences
> of the shots (Id. at 10);

> (7) Hameli conducted no testing (Id.);

> (8) Hameli relied on no formulas or
> calculations (Id.); and

> (9) Hameli was unable to ascribe any rate
> of error to his opinions. (Id.)

The record shows that Hameli admits that determining the
position of Fleming's body would require knowledge of "the
location of the gun that is fired [and] what angle the gun is
producing the firing bullet [sic]" id. at 17-18, and he concedes

35

that he does not know the height of the gun muzzles or the angle
of muzzles that fired the bullets. Id. at 16, 18.  Hameli also
admits that his opinions about the bullet trajectories are based
only on his reading of the autopsy report. Id. at 18.  Hameli
assumes that none of the bullet trajectories were changed by
impact with Fleming's body. Id. at 19.  Those admissions and
assumptions by Hameli, say the Defendants, render Hameli's
opinions about the sequence of shots and the location of Fleming
inadmissible.

The Plaintiff's only rejoinder is that Hameli reviewed
"piles of documents" along with photographs of the scene and of
the autopsy. (Docket No. 134, at 9). The Plaintiff therefore
apparently concedes the deficiencies iterated above and merely
contests the Defendant's argument that these deficiencies make
Hameli's reconstruction of the shooting excludable. Implied in
this position is that none of the iterated, nonexclusive
criteria identified in Daubert - the need for empirical testing
and verification, a preference for peer review and publication
of theories and techniques, a known rate of error, or acceptance
within the field - serve any purpose in the Rule 702 analysis.
Nor does the Plaintiff exhibit any concern about the need for
his expert to have sufficient and specific facts and data to
form the basis on his analysis. On this record, the Court must

36

find that Hameli's opinions on sequence of shots and the position of Fleming's body at various times before he fell to the floor are pure _ipse dixit_ of the sort the Court is not obliged to accept. See _Gen. Elec. Co. v. Joiner_, 522 U.S. 136, 146 (1997). To the extent that the Plaintiff has embraced a "Green Lantern Theory" of _Daubert_, whereby Rule 702's requirements can be overcome through sheer willpower and bare assertions, he is mistaken.   Therefore Hameli's opinion about the sequence of shots and the position of Mr. Fleming during the shooting are excluded as unreliable under _Daubert_ and Rule 702.

**D.   Opinion About Fleming's Pain and Suffering**

The fourth opinion challenged by the Defendants is Hameli's conclusion about Fleming's pain and suffering. The Defendants first argue that Hameli's characterization of that pain and suffering is imprecise and essentially no more than common knowledge that gunshot injuries are painful. (Docket No. 114, at 21).   Hameli did not offer any description of the pain other than that it "must have been excruciating." (See Hameli Report ¶ 14).   The Court agrees with the Defendants that this cursory statement is not the sort of expert opinion that will "assist the trier of fact to understand the evidence or to determine a fact in issues. _Daubert_, 509 U.S. at 591. "Evidence falling within the common knowledge of jurors, 'almost by definition,

can be of no assistance to a jury.'" U.S. v. Lester, 254 F.
Supp. 2d 602, 607 (E.D. Va. 2003) (quoting U.S. v. Harris, 995
F.2d 532, 534 (4th Cir. 1993)). The Court is confident that the
painful nature of gunshot wounds is common knowledge among
potential jurors within the Eastern District of Virginia.
Therefore, Hameli's opinion to that effect will be excluded.

Bevington also argues that Hameli's report provides no
basis for his opinion that Fleming's conscious pain from his
gunshot wounds lasted four to five minutes. (See Docket No. 114,
at 21). Rather than contest this assertion, the Plaintiff faults
Bevington for not questioning Hameli about his bases during his
depositions. (See Docket No. 134, at 7). The Plaintiff then goes
on to assert that Hameli, if he had been questioned, would have
explained "that a person with the kinds of injuries sustained by
Fleming would lose consciousness and go into shock within 3 or
more minutes." Id. at 8.[14]

The Defendants did not initially frame their motions as
challenges to Hameli's report under Fed. R. Civ. P.
26(a)(2)(B)(i). However, Bevington correctly points out in his

---

[14] The Plaintiff's response also characterizes the 4-5 minute
period as being inclusive of the time Fleming was exposed to
tear gas before being shot. That contradicts the conclusions of
Hameli's report, which described a 4-5 minute period of
conscious pain in addition to a 2 minute period of tear gas
exposure. (Compare Docket No. 134, at 8 with Hameli Report ¶
14).

38

Reply that the Plaintiff's Response runs afoul of that Rule. (See Docket No. 140, at 5). Rule 26(a)(2)(B)(i) requires an expert witness's written report to be "a complete statement of all opinions the witness will express and the basis and reasons for them." However, arguments raised for the first time in a reply brief will not be considered because the opposing party has not had an opportunity to address them.[15]   See Silicon Knights, Inc. v. Epic Games, Inc., 551 Fed. App'x 646, 650 (4th Cir, 2013)(citing Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995)); United States v. Williams, 445 F.3d 724, 736 n.6 (4th Cir. 2006).

Wholly apart from the failure to abide by Rule 26, the Defendants argue that Hameli's testimony about Fleming's pain from the gunshot wounds is (that it "must have been excruciating") is speculative.   And, by any definition, it is speculative, and speculative testimony by experts is not admissible.   Tyger Const. Co. v. Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir. 1994); Anderson v. Nat'l R.R. Passenger Corp., 866 F. Supp. 937, 943 (E.D. Va. 1994).   For that reason,

---

[15] Contrary to the assertions of Plaintiff's counsel, Rule 26 does not permit an expert witness to withhold his basis from his written report, much less compel opposing counsel to ferret out a witness's reasoning through direct questions.

Hameli's opinions that Fleming's pain, after having been shot, "must have been excruciating" is not admissible.[16]

**4.   Motions to Exclude Chad L. Staller and James Markham (Docket Nos. 111, 115)**

**A.   Background**

Chad L. Staller and James Markham are two forensic economists who have been retained by the Plaintiff to estimate the total economic loss resulting from Fleming's death.  They intend to offer opinions on three major topics related to damages:  (1) Fleming's lost future earnings;  (2) the lost value of Fleming's future household services;  and (3) the amount of Fleming's future earnings that would have been consumed by personal maintenance expenditures.  The Defendants do not challenge Staller and Markham's qualifications as expert witnesses or their opinions about future maintenance expenditures.  Instead, they challenge the opinion about lost future earnings (and to a much lesser extent, the opinion about lost household services) as being speculative and based on unrealistic assumptions that disregard important facts.

---

[16]  Bevington also argued that the Plaintiff could not recover damages for pain and suffering, therefore rendering any testimony on that point irrelevant.  (Docket No. 114, at 20-21).  Because the Court has already excluded Hameli's conclusions about the nature and duration of Fleming's suffering, it will not reach this question of law.

The record shows that Fleming was a 22-year-old male with a substantial criminal record and multiple, albeit brief, periods of incarceration. At the time of his death, Fleming was on probation and under a suspended sentence of five years. He was also facing criminal charges for robbery and use of a firearm in commission of a felony.

Fleming dropped out of high school during the 10th grade and neither graduated nor obtained a GED. He received vocational training as a forklift operator in 2007, but there is no indication that he ever used his operator's license, which expired shortly before his death. While he was a teenager, Fleming worked intermittently at a variety of minimum wage jobs with local employers like Car Pool, Great American Buffet, McDonald's, and Target. Fleming never earned a wage greater than $9 an hour and never received a documented annual income greater than $4000. At the time of his death, Fleming had not been employed by a business for almost three years.

The Plaintiff claims that Fleming was a self-employed landscaper. However, the Plaintiff admits that Fleming did not have a business name; that the Plaintiff never saw Fleming perform any landscape work; and that the Plaintiff never saw Fleming receive any pay for landscape work. There is no evidence of how often, if ever, the alleged landscape work was performed;

41

the locations where Fleming allegedly performed it; or the rate of compensation for such work, if any.

At the time of his death, Fleming had five children under the age of three. None of those children ever lived with the decedent.

Staller and Markham's future earnings analysis is relatively simple. As their starting point, they used the national average earnings for American males with some high school education which, in 2011, was $26,862. They then assumed that Fleming would continue to work until he was 53.54 years of age, the national average for males of Fleming's age and education. Staller and Markham then totaled the earnings for those 30-odd years while applying standard adjustments for income growth and discounting to present day value. They arrived at a final estimate of $1,032,049 in lost earnings.

Staller and Markham calculated their estimate of lost household services using a national Department of Labor study. The study data indicated that working males with dependent children spent 16.38 hours per week performing household services, while working males with dependent children under age 6 spend 21.91 hours per week. Staller and Markham's report indicates that they used these figures when calculating their estimate of Fleming's lost time providing future household

42

services.[17] Staller and Markham estimated the value of Fleming's time at $10.37 an hour, based on a composite measure of wages in numerous low-wage occupations in the Richmond, VA area. Their calculations produced a lost benefit of $98,362 through the year 2030.

## B.  Applicable Law

As the Supreme Court has explained:

> conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The Second Circuit has stated this proposition in plainer terms: "[E]xpert testimony should be excluded if it is speculative or conjectural or if it is based on assumption that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)(internal quotations omitted); Cf In re Air Crash Disaster at New Orleans, 795 F.2d 1230, 1235 (5th Cir. 1986)

---

[17] For unexplained reasons, Staller and Markham wrote that they "reduced by one-half" the figures cited.

(finding "the assumptions of plaintiffs' economist so abusive of the known facts, and so removed from any area of demonstrated expertise, as to provide no reasonable basis for calculating" damages). In a limited number of decisions, this standard has been applied to economist testimony about lost future income.

In Boucher, the Second Circuit held that, "[w]here lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employments prospects." Id. Because the expert's testimony offered was "based on the unrealistic and speculative assumption that [the plaintiff] would have been employed on a permanent, full-time basis, year in and year out, had he not been injured," the Court of Appeals held that the district court had abused its discretion in permitting an expert to testify about the plaintiff's lost earnings capacity. Id. at 22. Before his accident, Boucher had been employed sporadically, with low pay, minimal fringe benefits, and long spells of no income at all. Id. Nonetheless, the expert assumed that the plaintiff would have "work[ed] 40 hours per week, 52 weeks per year, with fringe benefits and regular pay increases, for the rest of his career." Id. The Second Circuit found that the opinions about both the lost earnings and the fringe benefits were not "accompanied by a

44

sufficient factual foundation before [they were] submitted to the jury" and therefore inadmissible under Rule 702. Id. (quoting Gumbs v. International Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983)).

In Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000), an expert on economic damages assumed that the plaintiff was 100 percent disabled, even though he had received a report indicating that the plaintiff was no more than 75 percent disabled and the plaintiff's demonstrated ability to earn a limited income after her injury. Id. at 755-56. The expert also assumed that the plaintiff would have earned over $12,000 a year if not for her disability, even though the plaintiff had earned less than half of that amount in the year before her injury. Id. Finally, the expert failed to adjust his estimates of the plaintiff's working life-span to reflect testimony about the plaintiff's pre-existing medical conditions. Id. at 756. The Third Circuit found that these assumptions lacked a sufficient factual foundation and held that the district court had abused its discretion by admitting the expert's testimony. Id.

The Defendants have also directed the Court's attention to Brunker v. Schwan's Home Service, Inc., Case No. 2:04cv478, 2006 WL 5186489 (ND. Ind. Oct. 23, 2006) wherein the district court excluded an economist's proffered testimony about lost wages and

45

benefits. The economist's basic conclusions were that the plaintiff Brunker was employable in the future and could have earned "a salary commensurate with the national mean earnings of all high school graduates." The district court described these conclusions as "[a]t most . . . straightforward comparisons of Brunker to broad categories of the population." Id. at *3. The court was troubled by the expert's failure to explain his "disregard [for] Brunker's medical condition, education level, work experience, or the economics and employment statistics of the regional job market," and found that "[t]he rudimentary comparisons of Brunker's earnings . . . to a broad national average for high school graduates, is not the 'specialized knowledge' that Rule 702 contemplates as giving assistance to the trier of fact to understand the evidence." Id.

### C.  Analysis

Staller and Markham's analytical framework bears the same relationship to admissible expert testimony as a paint-by-numbers kit bears to fine art. Its competence is overshadowed by its generic patterns and oversimplified assumptions about the subject matter.  Notwithstanding that they had access to discovery materials, police records, educational records, and employment records, Staller and Markham used no personally identifiable information about Fleming other than his age, his

46

level of educational attainment, and the ages of his children. They have explicitly based their calculations on national averages for Fleming's age cohort and educational level; no attempt was made to account for the effects Fleming's criminal record or his employment history.   In doing so, Staller and Markham have ignored the need to ground their analysis in "facts and circumstances personal to the plaintiff as an individual, not merely to [his] membership in a statistical class." Musick v. Dorel Junveile Group, Inc., 818 F.Supp.2d 960, 962 (citing Bulala v. Boyd, 239 Va. 218, 389 S.E.2d 670, 677 (1990)) (applying state law on admissibility of expert testimony).

A comparison between the reported income of Fleming in his last years with the future income estimated by these experts conclusively demonstrates that Staller and Markham's assumptions are "unrealistic and contradictory" to the point of being an "apples and oranges comparison" between Fleming and his general age cohort. Staller and Markham's report projects that, after a three-year absence of documented income, Fleming would have immediately started earning an annual income of $26,862 and thereafter maintained continuous employment for the next three decades. As indicated by the employment documents reviewed by the experts, $26,862 is roughly four times as much documented income as Fleming earned in his entire life, and over six times

as much documented income as Fleming ever earned in a single calendar year. Even allowing for some minimum wage employers that documented the fact of Fleming's employment but not his compensation, it is clear that the report projects a dramatic and permanent increase in Fleming's annual earning capacity after a three-year period in which there is no solid evidence that he was gainfully employed.[18]

Staller and Markham assume that, from 2011 onwards, Fleming's income would bear a reasonable resemblance to that of an average 22-year-old individual with a high school education. They do not even acknowledge that Fleming's past income was drastically less than their averages would suggest, much less attempt to explain why the factors which had depressed Fleming's earnings in the past would not affect him in the future. Indeed, there is no indication that Fleming suffered from any temporary

---

[18] As a general matter, the Court is well aware that income levels may fluctuate over time in ways that can appear disjunctive. A college-educated woman may temporarily drop out of the labor force to raise her small children and then return to work; her age and educational status will not change significantly but it is reasonable to project substantial future earnings going forward even if she received no compensation during her time as a homemaker. A person who survives a bout with cancer or mental illness may also recover from a disruption in employment, even one that lasts for several years. For many people, the vagaries of chance and circumstance will temporarily or permanently affect their income level in ways that boost them above the national averages or depress them below the mean. That is not so, here.

disability or circumstances beyond his control. His history appears to have been a function of his limited work ethic and criminal activities, and no one, not even Staller and Markham, has suggested that Fleming was in the process of rehabilitating himself as a productive member of society.

It is this refusal to distinguish Fleming's employment history, together with the inability to reconcile the future income projections with past amounts of documented income, that leads the Court to conclude that Staller and Markham's proposed testimony about Fleming's lost future earnings is speculative and conjectural, based on unrealistic assumptions, and not the product of reliable methods and principles. Therefore the testimony is inadmissible under Daubert and Rule 702.[19]

Staller and Markham's report also assigns a value to the lost future household services that Fleming would allegedly have provided to his children. In light of deposition testimony that none of Fleming's young children ever resided with him, and in the absence of any substantive evidence about Fleming's relationship with the children or what, if anything, he did to

---

[19] The third component of Staller and Markham's opinions is the amount of lost future income that would have gone to Fleming's personal maintenance. See Staller and Markham Report, at 5. Because this estimate of personal maintenance is based on the estimate of lost future income, see id. at 3, it is likewise unreliable and inadmissible under Rule 702.

care for them, it is impossible to consider reliable the
assumption that Fleming would devote the national average of
21.91 hours per week performing services for his young children.
The simple fact is that Staller and Markham's projections of
Fleming's lost household services are speculative and
conjectural, based on unrealistic assumptions, and not the
product of the reliable methods and principles demanded by
<u>Daubert</u> and Rule 702.

### CONCLUSION

Defendant Bevington's MOTION TO EXCLUDE PLAINTIFF'S EXPERT
WITNESS DR. PHILIP P. HAYDEN (Docket No. 107) and Defendant
Moore's MOTION TO EXCLUDE DR. PHILIP P. HAYDEN (Docket No. 121)
will be granted in part and denied in part.

DETECTIVE BEVINGTON'S MOTION TO EXCLUDE DR. KENNETH OKAFOR
(Docket No. 109) and Defendant Moore's MOTION TO EXCLUDE DR.
KENNETH OKAFOR (Docket No. 117) will be granted.

DETECTIVE BEVINGTON'S MOTION TO EXCLUDE DR. ALI Z. HAMELI
(Docket No. 113) and Defendant Moore's MOTION TO EXCLUDE DR. ALI
Z. HAMELI (Docket No. 119) are granted.[20]

---

[20] Hameli will be allowed to offer testimony about the physical
track and impact of the bullets on Fleming's body, since those
opinions were not challenged by the Defendants.

DETECTIVE BEVINGTON'S MOTION TO EXCLUDE CHAD L. STALLER & JAMES MARKHAM (Docket No. 111) and Defendant Moore's MOTION TO EXCLUDE CHAD L. STALLER AND JAMES MARKHAM (Docket No. 115) are granted.

It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process.

It is so ORDERED.

                                        /s/        REP
                              _____
                              Robert E. Payne
                              Senior United States District Judge


Richmond, Virginia
Date:  September 30, 2014