

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

JOTAYNUN LEE, as Administrator
of the Estate of Jataynun
Trayvon Fleming, Deceased, as
Next Friend of J.F., K.F.,
N.T., N.K., and J.W., Minor
Children of Jataynun Trayvon
Fleming, Deceased, and
Individually,

     Plaintiff,

v.                                    Civil Action No. 3:12cv471

CITY OF RICHMOND, VIRGINIA,
<u>et. al.</u>,

     Defendants.


**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANT WESLEY E. MOORE'S RENEWED MOTION FOR SUMMARY JUDGMENT (Docket No. 178). For the reasons set forth below, the motion will be granted.

**FACTUAL AND PROCEDURAL BACKGROUND**

On July 14, 2010, officers of the Richmond Police Department ("RPD") arrived at a private residence located at 304 Beaufont Hill Drive in Richmond, Virginia, to arrest Jataynun Trayvon Fleming ("Fleming") on a warrant for robbery accomplished by use of a firearm and for his involvement in a

homicide that had been committed earlier that morning. Tovar Declaration at ¶¶ 3-9, Docket No. 181-2; Fleming Wanted Poster, Docket No. 181-2. When police entered the residence, Fleming, who was lawfully inside, retreated to an upstairs bathroom and barricaded himself there. Tovar Declaration at ¶ 3, Docket No. 181-2. During this initial interaction, Fleming threatened to shoot any police officer or dog entering the bathroom. Prendergast Transcribed Internal Affairs Interview (Attached to Prendergast Declaration) at 4:1-6:2, 9:20-11:5, Docket No. 181-1.

After that initial interaction, the RPD officers called the RPD SWAT team, who responded to the residence. Tovar Declaration at 2-4, Docket No. 181-2. In addition to having been told about the threats that Fleming had communicated directly to the police officers who had attempted to arrest Fleming, the SWAT team was aware that the RPD had received information indicating that Fleming would "not go quietly" when confronted by police and that he was considered armed and dangerous. Wanted Poster, Docket No. 181-2; Tovar Declaration at ¶¶ 5-6, Docket No. 181-2. However, Fleming's father, the plaintiff Jotayun Lee ("Lee"), was present at the residence and informed the officers that Fleming did not have a firearm. Lee Declaration at ¶13, Docket No 186-2.

2

Officer Wesley E. Moore ("Moore") and Detective Todd James Bevington ("Bevington") responded to the residence on Beaufort Hills Drive on July 14, 2012 as members of the RPD SWAT team. Bevington Dep. at 54:11-25; 55:1-17, Docket No. 181-3. Moore had been advised by his supervisors that Fleming was wanted on robbery and firearm charges; that he was a suspect in an unrelated homicide that had occurred earlier that morning; and that he was considered armed and dangerous. Id. In addition, Moore was told that Fleming had made statements indicating his unwillingness to be quietly arrested and that he had threatened the police officers who had arrived to serve the arrest warrant. Id. After this briefing, Moore and the other members of the SWAT unit were directed to position themselves and to stage for making the arrest.

While Moore and other SWAT team members were waiting in the spare bedroom, Fleming remained barricaded inside the bathroom that was located off the master bedroom, which was across the hall from the SWAT team staging area. Declaration of Matthew Noedel, Exhibits A and B, Docket No. 179-9. Bevington repeatedly instructed Fleming on how to peacefully surrender, telling him to come out of the bathroom with his hands up. Bevington Dep. at 66:7-67:10, Docket No. 181-3. While barricaded, Fleming occasionally communicated with police

3

negotiators and members of the SWAT team; he repeated his claims that he was armed and again threatened police officers. Bevington Dep. at 83:6-19, Docket No. 181-3. Fleming asked the police negotiator what the officers would do if he exited the master bathroom with his "junk."[1] Tovar Declaration at ¶12, Docket No 181-2. This statement was passed along to members of the SWAT team inside the house. Bevington Dep. at 79:3-8, Docket No. 181-3; Moore Dep. at 44:6-45:2, Docket No 181-5; Tovar Declaration at ¶12, Docket No 181-2. Soon afterwards, Fleming repeated the question, asking "What are you-all going to do when I come out with my junk? What are you going to do when I come out with my shit? You-all better get ready to kill me." Bevington Dep. at 79:6-80:15, Docket No. 181-3. Moore heard Fleming posit that question. Moore Dep. at 44:6-45:2, Docket No. 179-2.

During the course of negotiations, the negotiation team deployed a "throw phone", which was capable of providing video

---

[1] Lee argues that the fact that Bevington originally stated that Fleming used the words "my junk or my shit" (Bevington Internal Affairs Interview, Docket No. 186-4 at 9) creates a material dispute of fact when compared to the statements Bevington made at his deposition claiming that Fleming exclusively used "my junk." Docket No. 186 at 9. That is not a material dispute of fact and thus will not preclude summary judgment.


surveillance of Fleming inside the bathroom.[2] Tovar Declaration at ¶11, Docket No 181-2; Bevington Dep. at 75:8-24, Docket No. 181-3; Moore Dep. at 103:17-104:3, Docket No. 181-5. The negotiation team informed Lt. Tovar, who was the SWAT commanding officer, that, based on the surveillance through the throw phone, they believed that Fleming had a gun tucked into his waistband. Tovar Declaration at ¶11, Docket No. 181-2; Bevington Dep. at 81:14-17, Docket No. 181-3; Moore Dep. at 47:22-48:2, Docket No. 181-5.[3] This information was relayed to Moore and other SWAT team members who were inside the residence. Id.

The negotiations continued for several hours, after which supervisors determined that Fleming's behavior indicated that he

---

[2] Lee objects to the consideration of any evidence that the SWAT team obtained by viewing Fleming by using the throw phone because the throw phone did not record any video or audio during the stand-off. Docket No. 186 at 9. He argues that "a negative inference against defendants" should be permitted, which apparently means that he wants the Court to assume that Fleming was not seen to have a gun and that he did not communicate threats to SWAT negotiators. Id. However, the absence of evidence does not create a factual dispute in this case because there is positive evidence to show that Lee's requested "negative inference" is incorrect.

[3] Lee objects that testimony about what Lt. Tovar was told by members of the negotiation team and thereafter passed along to the SWAT team staging inside the house as inadmissible hearsay. Docket No. 186 at 10. However, the testimony is not being offered for the truth of the matter asserted (all parties admit that Fleming did not have a gun as he was believed to), but rather is being offered to show the statement's effect on the hearers, it is not hearsay. Therefore, any objection is overruled.

was preparing to exit the bathroom in a violent manner. Tovar Declaration at ¶¶ 13-14, Docket No 181-2.  To prevent that from happening, SWAT officers decided to fire tear gas into the master bathroom to force Fleming to exit and surrender.  Id. Bevington and the other SWAT team members were informed of this decision and the reasons for it.  Moore Dep. at 55:24-56:6, Docket No 181-5; Bevington Dep. at 83:16-25, Docket No. 181-3. The team members then put on gear and gas masks to protect themselves from the tear gas.  Bevington Dep. at 91:12-15, Docket No. 181-3; Moore Dep. at 55:24-56:6, Docket No. 181-5.

At this point, Moore was stationed as the first officer in the team.  Moore Dep. at 55:24-56:6, Docket No. 179-1.  Moore, as the first officer in line, was positioned in the doorway of the spare bedroom in a squatting position, holding a ballistic shield with one hand and a pistol in the other.  Moore Dep. at 38:16-24, Docket No 181-5.  Bevington, as the second officer, was leaning over the top of Moore and was holding a rifle. Bevington Dep. at 92:18-93:10, Docket No. 181-3.  The other SWAT team members, who were to follow the first two officers, were also carrying M-4 rifles and their service pistols.  Moore Dep. at 39:1-24, Docket No. 181-5; Bevington Dep. at 86:21-87:14, Docket No. 181-3.

6

Two tear gas canisters were deployed into the master bathroom where Fleming was barricaded. Bevington Dep. at 91:12-92:4, Docket No. 181-3; Moore Dep. at 63:1-7, Docket No 181-5. Moore heard Fleming cough. Moore Dep. at 76:24-68:17, Docket No 181-5. Thereafter, Fleming exited the master bathroom into the master bedroom. It is undisputed that Fleming advanced toward the officers who were waiting approximately 13 feet away in the spare bedroom across the hall.[4] Bevington Dep. at 93:11-21, Docket No. 181-3; Moore Dep. at 68:11-17, 71:3-17, Docket No. 181-5.

Moore and Bevington both testified that, when Fleming exited the master bathroom and ran toward the SWAT team, he was pointing his hands at the SWAT team as if he was holding a gun. Moore Dep. at 71:3-17, Docket No. 181-5; Bevington Dep. at 96:1-

---

[4] Lee appears to dispute the assertion that "Fleming exited the bathroom very quickly...while moving directly towards Detective Bevington and Officer Moore." Docket No. 181 at 5. Lee states that "[t]he SWAT officers...were not in the direct path of the exit from the master bathroom." Docket No. 186 at 11. That evidence, however, does not dispute the proofs that Fleming advanced, at more than a walk, toward the officers who were threeen feet away, especially considering that Moore testified that Fleming was, indeed, charging at an angle when he exited the bathroom. Moore Dep. at 113:24-114:9, Docket No. 181-5. All other testimony from those at the scene confirms that Fleming was advancing toward the officers. Some say he was charging. Others say he was moving quickly. In any event, Lee offers no evidence to the contrary, relying instead only on argument.

5, Docket No. 181-3.   Moore and Bevington have testified that
Fleming's hands were wrapped in cloth and that there was a black
cylindrical object pointing from the end of the cloth that, to
them, looked like the muzzle of a gun.   Moore Dep. at 72:6-73:5,
Docket No. 181-5; Bevington Dep. at 94:18-22, Docket No. 181-3.
Bevington believed it to be the 9 mm handgun that Fleming had
been reported to have been carrying.   Bevington Dep. at 95:23-
96:2, Docket No. 181-3.   In reality, what Moore and Bevington
thought was a gun was a black women's high heeled shoe wrapped
in a t-shirt.[5]   Bevington Dep. at 96:10-11, Docket No. 181-3.

    Moore   and   Bevington's   testimony   is   supported   by   the
internal affairs interview given by Sargent McQuail, who was
also a member of the RPD SWAT team that responded to Fleming's
residence.    McQuail   Declaration   at   ¶2,   Docket   No   188-15.
McQuail stated that one of Fleming's arms was rolled up in a
shirt or a towel and that, after the encounter, McQuail saw a

---

[5] Lee argues that Moore "saw the muzzle of the barrel of
Fleming's 'handgun' and knew that it had no hole from which a
bullet could be fired."   Docket No 186 at 11.   That argument
cites to Moore's deposition, in which he testified that he
"couldn't really say [the shoe] had a hole in it" but reiterated
that "it was a black object that was pointing out...[and] looked
like a barrel."   Moore Dep. at 72:25-73:5.   Thus, the cited
testimony does not in any way support Lee's assertion that Moore
actually recognized that Fleming was carrying a shoe, rather
than a gun.   To the contrary, the testimony shows that Moore
thought (and reasonably so) that Fleming had a gun.

black shoe laying on the floor in the master bedroom. McQuail
Interview at 12-14, Docket No. 188-15. That shoe and the blood-
stained t-shirt appear in photographs of the scene. Docket No.
179-9, 11-13.

Sergeant Hayes and Officer Musselwhite were assigned to the
"arrest team" at the time of the shooting and were tasked with
securing the suspect and removing him from the scene.
Musselwhite Dep. at 5: 12-24, Docket No. 189-6; Hayes Dep. at
32:25-33:5, Docket No 189-7. Hayes testified that, when he was
securing the suspect and removing him from the house, he did not
see any "cloth-like" material near Fleming, nor did he see any
shoe in Fleming's vicinity. Hayes Dep. at 69:18-71:23, Docket
No. 189-7. However, Hayes also testified that he was "more
worried about getting [Fleming] handcuffed, picking him up, and
getting him downstairs to get him to the hospital", than
surveying the scene for evidence. Id. at 71:14-17.
Musselwhite, on the other hand, recalls seeing a "white towel or
light colored towel...on the ground next to the suspect"[6] when he
entered the room, but does not recall seeing a shoe in Fleming's
vicinity. Musselwhite Dep. at 16:12-14, Docket No. 189-6.

[6] Lee appears to assert that the fact that Musselwhite recalls
seeing a "white towel or light colored towel" rather than the
grey t-shirt that was found on the scene creates a dispute of
fact. Docket No. 187 at 10, ¶18. That difference may posit a
dispute, but it certainly is not a material dispute.

As Fleming charged the officers, Moore, who was crouched and holding a ballistics shield, fired a single shot from his service pistol at Fleming. Moore Dep. at 73:14-25, Docket No. 181-5. That was the only shot that Moore fired, because he was concerned about keeping the shield that he was holding in front of what he believed to be Fleming's handgun. Id. at 87:5-10; 79:10-25.[7] The evidence shows that Moore's shot hit Fleming in the thigh.[8]

What happened after Moore fired his first and only shot is the subject of slightly different testimony. Bevington has stated that, when he began firing, Fleming was still standing, coming toward police officers, and pointing what Bevington believed to be a gun at the SWAT team. Id. at 103:12-18; 106:1-23. Bevington then fired one volley of shots, paused for "less than seconds", and fired another round of shots. Id. at 106:24-107:7. According to Bevington, Fleming fell to the ground after

---

[7] As Moore fired his one round, Bevington states that Moore shifted his shield slightly upward, bumping Bevington's rifle. Bevington Dep. at 96:25-97:19, Docket No. 181-3. Because of the bump, Bevington did not see who fired the initial shot, nor did he see a muzzle flash. Bevington Dep. at 98:24-99:1, Docket No. 181-3. However, Bevington believed that Fleming had fired the initial shot. Id. at 103:6-18.

[8] Fragments from a bullet of the type used by Moore were recovered from the wall behind where Fleming was standing when Moore fired. Lee contends that there is a dispute on this point between two defense experts. However, the record shows that there is no such dispute.

the first round of shots, but attempted to get back up while continuing to brandish what Bevington believed was a weapon. Id. at 107:18-24.  Bevington testified that he fired the second round of shots in order to neutralize the threat presented by what he thought was Fleming's weapon.  Id.  Bevington stopped firing when Fleming rolled over, and Bevington could no longer see what he believed to be Fleming's weapon.  Id. at 106:24-108:2; 113:19-114:1.   In total, Bevington fired 8 rounds. Provost Declaration at ¶5.   According to Bevington, the team began moving toward Fleming "immediately after" he finished firing all of his shots.  Bevington Dep. at 109:10-14, Docket No. 181-3.  Therefore, except for a possible movement of a short distance into the hallway between the two bedrooms, Bevington has testified that all of his shots were fired from the threshold of the bedroom door in which the SWAT team had been staging.  Id. at 110:16-111:12.

Moore, however, describes a slightly different order of events.  He states that, after he fired one shot, the SWAT team immediately began advancing toward Fleming.  Moore Dep. at 81:24-82:3, Docket No. 181-5.  At that time, Fleming "wasn't on his feet...[but] was laying down sideways with his weapon pointed up."  Id. at 82:18-24.  Moore went on to explain that Fleming was on the ground "probably kind of leaning up," still

pointing what he believed to be a weapon at the team. Id. at 82:9-24. At that point, Moore heard the shots that Bevington fired. Id. at 83:4-12.

After the shooting had come to an end, the RPD SWAT team secured the master bedroom and bathroom. The arrest team placed Fleming in handcuffs and took him downstairs to a waiting ambulance which transported him to MCV, where he was pronounced dead within 30 minutes. Richmond Police Department Force Investigation Team Report, Background Investigation at 3, Docket No 179-18. No gun was found on Fleming's person, in the master bedroom, or in the master bathroom where Fleming had barricaded himself. Photographs of the scene reveal a woman's high-heeled shoe and a bloodied light-colored t-shirt on the floor of the master bedroom near where Fleming had fallen.

Lee, Fleming's father and the Administrator of his Estate, filed an Amended Complaint, Docket No. 38, that presented three counts against Moore, in addition to other defendants. Id. Count I, filed pursuant to 42 U.S.C. § 1983,[9] alleges that

---

[9] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..."

Moore's actions constituted an unlawful seizure of Fleming's person under the Fourth Amendment[10] and thus that Moore had violated Fleming's rights under the Fourth Amendment. Id. at 8-9. Count II alleges that Moore had violated Lee's and Fleming's children's substantive due process rights by depriving them of their liberty interest "in the companionship, care, custody, and management" of Fleming. Id. at 9-11. Count III alleged that Moore caused Fleming "to suffer great pain, suffering and anguish" during the July 14, 2010 standoff and subsequent shooting. Id. at 11. On March 27, 2013, Counts II and III of the Amended Complaint were dismissed in their entirety and Count I was dismissed to the extent that it alleged claims on behalf of Lee individually or of Fleming's minor children under Fed. R. Civ. Pro. 12(b)(6). Docket Nos. 79-80.

On September 6, 2013, Moore filed a Motion for Summary Judgment assuming that Defendants' motions to exclude experts were denied (Docket No. 152) and a Second Motion for Summary Judgment assuming that Defendants' motions to exclude experts were granted (Docket No. 149). Both of these motions were

---

[10] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

13

denied without prejudice, because the Defendants' Motions to Exclude Experts were granted in part and denied in part. Docket Nos. 173 & 174. Defendants were permitted to file renewed summary judgment motions. Docket No. 175. Moore filed the pending renewed summary judgment motion, and it has been briefed and argued.

## APPLICABLE LEGAL FRAMEWORK

### I. Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. f6(c). In Celtotex Corp. v. Caltrett,[11] the Supreme Court stated that Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. In order to enter summary judgment "there can be no genuine issue as to

---

[11] 417 U.S. 317 (1986).

any material fact, since a complete failure to proof concerning an essential elements of the nonmoving party's case renders all other facts immaterial." Id. at 323.

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seabulk Offshore, Ltd. V. Am. Home. Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). To successfully oppose a documented motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "Where...the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## II. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code (§1983) provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

15

> be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The statute, of course, does not create a substantive cause of action. It merely provides a procedural vehicle giving access to the federal courts in which to seek redress of violations of federal constitutional or statutory rights. Amato v. City of Richmond, 875 F. Supp. 1124, 1132 (E.D. Va. 1994); aff'd 78 F.3d 578 (4th Cir. 1996). Thus, to prevail, Lee must establish that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). There is no dispute that Moore was acting under color of state law at the relevant time. The asserted federal right is the right to be free of unreasonable seizure under the Fourth Amendment to the United States Constitution.

## DISCUSSION

Moore has moved for summary judgment on the merits of Count I, asserting that the record shows that he acted reasonably in shooting Fleming. Alternatively, he seeks summary judgment on

16

his defense of qualified immunity. "Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings." Amato v. City of Richmond, 875 F. Supp. 1124 (E.D. Va. 1994); aff'd 78 F.3d 578 (4th Cir. 1996) (citing Karsten v. Kaiser Found. Health Plan of the Middle Atlantic States, Inc., 36 F.3d 8, 11 (4th Cir. 1994). However, this case presents an exception predicated on judicial efficiency. Hence, each ground for summary judgment will be addressed.

## Count I:  Unreasonable Seizure in Violation of the Fourth Amendment:  The Merits

### A.  Legal Principles

Claims of excessive force during the course of a seizure "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1986). In the Fourth Circuit, "[t]he question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001). "Determining whether the force used to seize an individual is 'objectively reasonable' requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental

17

interests at stake." <u>Swann v. City of Richmond</u>, 498 F. Supp. 2d 847, 854 (E.D. Va. 2007) (quoting <u>Graham</u>, 490 U.S. at 396).

It "has long been recognized that the right to make an arrest...necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it", but the reasonableness of such physical coercion depends on the specific circumstances of the encounter at issue. <u>Graham</u>, 490 U.S. at 396. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical operation", but instead "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Bell v. Wolfish</u>, 441 U.S. 520, 529 (1979); <u>Graham</u>, 490 U.S. at 396.

In addition, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. at 396. Thus, courts must allow "for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving." <u>Id.</u> at 397. "The court's

18

focus should be on the circumstances at the moment the force was used and on the fact that officers...are not often afforded the luxury of armchair reflection." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996)(citations omitted). The Fourth Circuit "has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." Anderson v. Russell, 247 F.3d 125, 131. "The Fourth Amendment does not require omniscience....Officers need not be absolutely sure...of the nature of the threat or the suspect's intent to cause them harm – the Constitution does not require that certitude precede the act of self-protection. Russell, 247 F.3d at 132.

## B. Were Fleming's Fourth Amendment Rights Violated?

Moore argues that his actions on July 14, 2010 were reasonable and thus did not violate Fleming's Fourth Amendment right against unreasonable seizures. Lee maintains that there are several material disputes of fact that render summary judgment inappropriate. Thus, the first task is to determine whether there are genuine disputes of material fact.

### 1. The Alleged Factual Disputes

Lee has identified disputes of fact that he says foreclose summary judgment.[12] Each will be addressed in turn.

#### (i) Perceived Presence of a "Gun"

There is now no dispute that Fleming was armed for we now know that he was not. The issue is whether there is a genuine dispute of fact whether the officers reasonably perceived Fleming to have been armed when he left the bathroom and advanced toward them. On that issue, Lee argues that the previously recited differences between the testimony of Bevington and Moore (both of whom perceived that Fleming was armed as he advanced) on the one hand, and the testimony of Musselwhite and Hayes (about what they saw after the shooting was over) creates a genuine dispute of fact whether Bevington and Moore reasonably perceived Fleming to have been armed as he advanced toward them. Lee's argument lacks merit.

To begin, the critical time is when the officers fired on Fleming; and, on that point, the most pertinent evidence is that given by Bevington and Moore both of whom explained that Fleming

---

[12] Lee alleges that there are several "disputes" of fact. Most of these perceived disputes are based on selective citation of the record or that attempt to create material disputes of fact out of unimportant details. Contentions of this sort need not be addressed. The Court will focus on what it perceives from the briefs to be Lee's dispositive points, but will address briefly some of Lee's miscellaneous points.

appeared to be carrying a pistol wrapped in a piece of white cloth of some kind. Both officers were clearly focused on Fleming from the time that he left the bathroom. Both officers gave consistent accounts of what they saw in Fleming's hand: a gun wrapped in cloth. No witness contradicts them as to the circumstances that were extant just before Fleming was shot.

McQuail, another member of the SWAT team, testified that he saw a shirt or a towel wrapped around Fleming's arm and that, after the shooting he saw a black woman's high-heeled shoe on the floor in the master bedroom. That, of course, corroborates the testimony given by Bevington and Moore.

Musselwhite and Hayes, on whose testimony Lee predicates the existence of a genuine dispute of material fact as to whether there was a perceived gun, testified only about what they saw after the shooting, not before it had occurred or while it was happening. Musselwhite said that, after the event, he saw no shoe near Fleming, but that he did see a white or light-colored towel next to where Fleming lay wounded. Hayes did not recall seeing either a shoe or a towel near Fleming.

The testimony of Musselwhite does not create any conflict with what Bevington and Moore said. In fact, that Musselwhite saw a white or light-colored towel near where Fleming lay wounded supports, rather than disputes, the testimony given by

Bevington and Moore.   Considering the record as a whole, that neither Musselwhite nor Hayes saw a shoe near Fleming after he had been shot does not create a genuine dispute of material fact as to whether, as Fleming advanced toward the officers, he carried what appeared to be a gun wrapped in a cloth.   Moreover, photographs taken at the scene show that there was a black high-heeled shoe on the floor nearby.   Nor does Hayes' failure to recall the presence of a towel or a shoe create a genuine dispute of material fact because "a lack of recollection does not create an issue of fact that will defeat a motion for summary judgment."   Hubbard v. Bohman, 2013 WL 2645260 at 8 (M.D.N.C. 2013)).

Relatedly, Lee argues that there is a conflict between Moore and Bevington about whether Fleming charged the officers as he exited the bathroom.   In fact, there is no such conflicting evidence.   No matter how Fleming's conduct is described, it is beyond dispute that he was advancing toward the officers as he exited the bathroom.   And, even if there is some slight difference in the descriptions of Fleming's pace, "the fact that the...police officers on the scene have slightly differing recollections of the cardinal facts (although the agree as to the vast bulk of the facts) does not itself generate

a triable issue precluding the entry of summary judgment."
Moore v. Winer, 190 F. Supp.2d 804, 806 (D. Md. 2002).

Even if the record is construed to find that there are
disputes of fact about Fleming's pace and as to who saw the shoe
and the cloth, the disputes would not be as to material facts.

Of course, the materiality of the disputed facts must be
assessed on the record as a whole including the part of the
record that is beyond dispute. Thus, the assessment begins with
the understanding that the following facts are not disputed. On
July 14, 2010, Fleming was wanted on a warrant for committing
robbery with a firearm and was a suspect in a homicide that had
been committed that morning. In the hours leading up to
Fleming's exit from the master bathroom, Fleming had made
repeated threats of violence against police. He had told
officers attempting to arrest him that he would shoot any
officer or canine attempting to enter the area in which he had
barricaded himself. Before that, Fleming had informed others
that he would not surrender quietly if confronted by police.
During the standoff with RPD SWAT, Fleming had repeated his
threats to negotiators and to SWAT members staging inside the
house. Fleming claimed to have a gun in the bathroom and
questioned what the officers would do if he came out of the

bathroom with that gun.   Bevington and Moore knew all of this information before the encounter.

When Fleming left the bathroom after tear gas forced him to do so, he advanced toward SWAT team members, who were only 13 feet away.   As he advanced, Fleming was holding a high-heeled shoe wrapped in a cloth with the heel pointed toward the police officers.   To the officers, Fleming appeared to be advancing on them with a gun pointed in their direction.

Fleming's conduct, particularly in perspective of his previous threats, created the impression that he was pointing a gun at the officers as he advanced toward them.   No reasonable jury could find otherwise.   Bevington, as well as Moore, have testified that they thought Fleming was coming at them with a gun.   No one, and nothing cited by Lee, has shaken that testimony.

Whether Moore was reasonable in that belief when he fired on Fleming must be judged in perspective of the facts and circumstances known to him and that determination must not be made with 20/20 hindsight, Graham, 49 U.S. at 396.   And it must be made mindful that Moore had to make split-second judgment about how to react to Fleming's conduct, id.   That judgment, of course, had to be made in perspective of the severity of the crimes at issue, whether Fleming posed an immediate threat to

24

the safety of the officers and whether Fleming was actively resisting arrest or attempting to escape arrest by fleeing. Bell v. Wolfish, 441 U.S. 520, 529 (1979); Graham, 490 U.S. at 396. Every one of those factors describe the situation confronting Moore when he fired his first shot at Fleming.

In sum, there is no genuine dispute of material fact as to whether Fleming exited the bathroom and advanced toward the officers carrying a high-heeled shoe wrapped in a cloth with the heel pointing toward the officers. No reasonable jury could reasonably conclude that Fleming did not appear to be armed as he advanced toward the SWAT unit as to which Moore and Bevington held the first two spots in line.

### (ii) Perceived Disputes About Moore's Version of Events

Lee correctly argues that summary judgment cannot be granted where a credibility determination will decide the outcome of a material fact. And, he says that Moore's credibility is questionable because of a statement that he gave shortly after the event about the cloth and the high-heeled shoe. Specifically, Lee points out that Moore told an Internal Affairs investigator that "We actually had to unwrap it [the shoe] to see what it was that was still wrapped up in his hand as he went down when we actually got to 'em." PLAINTIFF

25

JOTAYNYUN LEE'S BRIEF IN OPPOSITION TO DEFENDANT MOORE'S RENEWED MOTION FOR SUMMARY JUDGMENT, p. 5 ("Plaintiff's Response," at ___) (citing Ex. 4, Moore's Interview). Moore also said: "Yes, we did see it when McQuail pulled the thing the shoe flow [sic] out." Id. These statements, say Lee, are called into question by the previously recited testimony of Hayes and Musselwhite. That, in turn, says Lee, creates a credibility issue on a dispute of material fact to be decided by the jury.

However, Lee does not specify what fact he thinks is placed in dispute. Giving Lee the benefit of the doubt, it appears that the putative material fact thought to be disputed is whether it was reasonable for Moore to believe that Fleming had what looked like a gun wrapped in a cloth as he advanced toward the SWAT team. As explained previously, Musselwhite's and Hayes' view of what happened after Fleming was shot is not the critical time: when Moore fired the one shot that he fired. And, to the extent that their testimony is said to cast doubt on Moore's credibility, the argument fails. That is because Musselwhite's testimony actually corroborates Moore's by showing that there was a cloth of the description given by Moore near where Fleming lay after he was shot. And, as explained previously, Hayes' failure to recall seeing a cloth or a shoe in the area is not the kind of testimony that creates a dispute at

all. That is particularly so here, where the photographs from the scene show both a cloth and a black high-heeled shoe near where Fleming lay after having been shot. On this record, nothing creates a credibility question as to the material fact whether Moore reasonably thought that Fleming was aiming a gun as he advanced toward the SWAT unit, and whether a reasonable officer in the same circumstances would have thought the same thing.

Lee also argues that Moore's version of events has "evolved over time" and that, of itself, raises the need for a credibility determination. Plaintiff's Response, at 5. However, Lee cites nothing to prove the argument. So it fails for that reason alone.

### (iii)   Lee's Assertion of Perceived Miscellaneous Disputes

In the Introduction to his Response Brief, Lee postulates several perceived disputes. They are outlined in the chart that appears in DEFENDANT WESLEY E. MOORE'S REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO RENEWED MOTION FOR SUMMARY JUDGMENT (Docket No. 190), pp. 2 and 3 ("Moore's Reply, at ___). In each instance, Moore has shown how those postulated disputes are without proof or are irrelevant or are simply wrong.

Then in the body of Moore's Reply, at 4-9, Moore addresses what Lee refers to as his Counterstatement of Disputed Facts. And, in each instance, Moore demonstrates how the points made by Lee are without proof or wrong. For example, Plaintiff's Disputed Facts 2, 4, 11, 12, 16, 17, 19 and 21 have no basis in the record. Plaintiff's Disputed Facts 4 and 27 are unintelligible. Plaintiff's Disputed Facts 18, 22, 26 and 29 either miss the point or are nonresponsive to the defendant's point. Plaintiff's Disputed Fact 18 misapprehends what Musselwhite and Hayes said and, for reasons expressed above, the testimony of those witnesses either provide no basis for a dispute or are not material or both. There is no need to set out those reasons yet again. The remaining Plaintiff's Disputed Facts are simply not material or are not fact issues (but instead are points of law which in each instance are wrong).

None of the perceived miscellaneous disputes foreclose summary judgment because: (a) they are not fact issues; (b) they are not disputes; or (c) they are not material. Thus, the matter is ripe for decision on the legally dispositive questions that are presented by the record.

### 3.   Whether Summary Judgment is Appropriate on the Merits

The dispositive issue is whether on this record, "a reasonable officer in the same circumstances [as Moore] would have concluded that a threat existed justifying the particular use of force." Anderson v. Russell, 247 F.3d at 129.   Moore was confronted with a person wanted for the violent crime of robbery who also was a suspect in a murder.   That person posed a grave threat to Moore's safety and that of the other officers, if as Moore reasonably thought, Fleming had a gun.   Fleming had threatened to kill the police officers.   And, of course, Fleming was violating the law by resisting arrest.   Moore made a split-second judgment (as he was entitled to do) under "tense, uncertain, and rapidly evolving circumstances."   Graham, 490 U.S. at 396.

No jury instructed on the applicable law could conclude that Moore acted unreasonably in firing the shot that he fired while Fleming was advancing on him and the SWAT unit with what Moore reasonably thought was a gun wrapped in a towel. Accordingly, Moore is entitled to summary judgment on the merits.

29

### 4.   Whether   Summary   Judgment   Is   Appropriate: Qualified Immunity

The foregoing analysis also would yield summary judgment on the plea of qualified immunity.   Qualified immunity protects police officers in the performance of their discretionary functions from civil liability under § 1983 so long as their conduct does not violate clearly established rights of which a reasonable officer in the shoes of the defendant would know. Rowland v. Perry, 401 F.3d 167, 173 (4th Cir. 1994).   The focus, of course, is on what the police officer reasonably perceived at the time that he acted and whether a reasonable officer armed with the same information, would have had the same perception and have acted in like fashion.   Id.   The doctrine of qualified immunity therefore assures that officers are not held liable for "bad guesses in grey areas;" and, instead, are liable only for transgressing bright lines.   Maciariello v. Sumner, 793 F.2d 295, 298 (4th Cir. 1992).   Put another way, qualified immunity affords officers additional breathing room for decisions made on the spot.   Merchant v. Fairfax, 778 F. Supp.2d 636, 647 (E.D. Va. 2011).

A fundamental purpose of qualified immunity is the need to avoid deterring police officers from engaging in vigorous law enforcement in difficult situations for fear that they will face

civil liability.   Rowland v. Perry, 41 F.3d at 172; Gooden v. Howard County, 954 F.2d 960, 965 (4tg Cir. 1992).   "The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick or decisive action in the face of volatile and changing circumstances."   Id.

The record is abundantly clear as to the facts confronting Moore at the time he fired on Fleming.   Those facts need not be here repeated, but they quite clearly establish that Moore faced what he reasonably perceived to be an imminent deadly threat to himself and other officers.   He was forced with the need to act in tense and fast-moving circumstances and to make a decision whether to fire or not.   His choice was a simple one:   fire and protect himself and other officers or delay to see what Fleming what do.

As the Fourth Circuit has held in deciding the applicability of qualified immunity:

> No citizen can fairly expect to draw a gun on police without risking tragic consequences.   And no court can expect any human being to remain passive in the face of an active threat on his or her life.   As Greenidge and Slattery illustrate, the Fourth Amendment does not require omniscience.   Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others.

31

> Officers need not be absolutely sure,
> however, of the nature of the threat or the
> suspect's intent to cause them harm – the
> Constitution does not require that certitude
> precede the act of self-protection.

Id. at 644. See also Slattery v. Rizzo, 939 F.3d 213 (4th Cir.

1991); Greenidge v. Ruffin, 927 F.2d 789 (4th Cir. 1991). The

decisions in Elliott, Slattery and Greenidge teach that

Bevington is entitled to prevail on the assertion of qualified

immunity.

## CONCLUSION

Without doubt, police officers who are doing their duty,

whether executing an arrest warrant or otherwise, are obligated

to exercise only such force as is reasonably necessary. But, as

this case illustrates, the job of a police officer is fraught

with danger from those who disobey their lawful commands or

resist arrest. Those who disobey a lawful command or resist

arrest make it necessary for police officers to use reasonable

force. And, as this case proves, the use of reasonable force

sometimes entails for the law violator or the resistor the risk

that he will be hurt or killed. When that happens, the law does

not sanction the vilification of, or the imposition of liability

on, the police officer who is doing his duty and acting

reasonably. Instead, the law affords protection to the police

officer. That is the result here.

Certainly, Officer Moore could have delayed in firing the shot that he fired at Fleming. To have done so, on the facts known by Moore, would have exposed him and other officers to injury or death. That would have been irresponsible on his part and it certainly was not required by the applicable law.

For the foregoing reasons, DEFENDANT WESLEY E. MOORE'S RENEWED MOTION FOR SUMMARY JUDGMENT (Docket No. 178) will be granted.

It is so ORDERED.

                                  /s/          _REP_

                            Robert E. Payne
                            Senior United States District Judge

Richmond, Virginia
Date:  March _18_, 2015

33